Our next case is Carl Henry, Inc. v. United States, 16-17-32. Mr. Koji, you reserved two minutes for rebuttal, is that correct? That is correct. Did I pronounce your name correctly? Koji, yes sir. All right, you may proceed. Your Honor, may it please the Court, my name is Brian Koji, I'm here on behalf of Carl Henry, Inc. The issue in this case is whether the government was required by the Contractual Price Adjustment Clause to compensate Carl Henry for increased costs that it incurred in providing mandated pension benefits, even though the increased costs took the form of withdrawal liability in this case. We submit that the Price Adjustment Clause does require reimbursement of the withdrawal liability and that the Court of Federal Claims erred by dismissing and focusing on whether or not the expense was the withdrawal liability was statutorily required. Did the NASA contract require you to negotiate the Teamsters contract or to join their board pension plan? The NASA requirement solicitation incorporated the fringe benefits and wages pursuant to the Service Contract Act. We were required to recognize the Teamsters. But all NASA did was require you to pay wages at a certain level. Wages and fringe benefits, including pension benefits. We had to provide... We didn't require anything other than that. Any other fringe benefits in the contract, severance, vacation pay, holiday pay, but in this issue, obviously, it's only the pension benefits that are issued. They didn't require that you have pension benefits through a particular group. For example, the Teamsters group. You're absolutely correct, Your Honor. The Service Contract Act provides that you have to provide a commensurate level of pension benefits that the predecessor contractor provided. In this particular case, Carl Henry chose to do that by agreeing to the same Teamsters plan that the predecessor was in. But you didn't have to do that. They could have selected another plan and provided the same level of benefits. So these different plans, do they involve different costs? Do they involve different costs to manage? Under the regulations of the Service Contract Act, Carl Henry wanted to provide a different pension benefit. It had to provide a commensurate level as per its cost. They could have provided a cash differential. But do the costs of the plan to Carl Henry, do they increase or decrease according to whichever plan you choose? The cost that Carl Henry would have been required to enter into a plan with similar costs at the time. Now, over projecting into the future, different plans could have different costs. They could have lower, they could have had a greater cost in this one. The fact in this case is that's the plan that they chose to get into, and that's the plan that is incorporated with each anniversary year as the new wage determination. So by the time you get past the three-year base period, the Carl Henry plan with the Teamsters one is the wage determination. They chose to get into that just as in the health insurance case. We cite to the Lear-Sigler case, which this court said if you have health insurance and the cost of the health insurance goes up, price adjustment is appropriate. In this case, when the cost of the pension benefits went up because the fund recognized that it was underfunded and charged you more to make up for that, the government compensated you for that, didn't they? They did partially. They compensated us for the increased hourly contributions. The difference between hourly contributions and withdrawal liability is one of timing. If Carl Henry had not been forced, if no fault was out of the plan, it would continue to make increased hourly contributions, and the government would have continued to reimburse them. Had it cured the deficiency, we would have received the price adjustments for the full underfunded amount. So then after you left Teamsters, you went to a different organization and got those fringe benefits and paid for those, and had those with the different entity increased, then the government would have paid for that, right? I presume. It's the hourly increase. I understand that once you left Teamsters, you had to go to another organization in order to have those fringe benefits or no? Because you were kicked out of the pension. Under the labor law, when the Teamsters were decertified, it was the employees voluntarily elected to bring in the IAM. At that particular case, what occurred in this case is that the IAM and Carl Henry now had an obligation to negotiate a new pension plan. It never reached the end of that negotiation, never entered into. The IAM, of course, wanted them to join their multi-employer pension plan in the hiatus period. Under the National Labor Relations Act, Carl Henry was required to continue to provide the pension benefits of the old plant, so they continued to make those contributions while also negotiating with the IAM. Had we negotiated and gotten into another plan with the IAM, which never occurred in this case, but had we done so, then yes, we would then be reimbursed for whatever plan the IAM. And that pension plan would have had to have equivalent benefits cost as the Teamsters plan. But the withdrawal liability, is there a requirement on NASA to reimburse that if you hadn't paid that? In our position, there absolutely is a requirement for them to reimburse it. There's a requirement for them to reimburse us for the cost of providing the pension benefits. And that is by statute, the definition of statute of withdrawal liability is that is Carl Henry's allocable share of already vested accrued benefits. So it's no different than the hourly contribution against one of time. We would have continued to pay our share through the hourly contributions. The employees elected to kick out the Teamsters, bring in the IAM, and that requires us to withdraw from the plan. We now have that accelerated so that all those hourly contributions, which were reimbursed, now are due right now through withdrawal liability. We think the Court of Federal Claims erred by looking at it from the perspective of is the withdrawal liability statutorily required? Is that a fringe benefit? We don't disagree that the withdrawal liability is not a fringe benefit. Employees are not getting any of that money. It just says they don't get health insurance premiums that the employer is paying. The fringe benefit in this case is the pension. We had an obligation once we chose pursuant to the Service Contract Act to get into that Teamsters plan. Way back in 2003, we had an obligation to provide those pension benefits. The government's obligation was to provide us for any increases in costs as a result of providing those benefits. Withdrawal liability, same as the hourly contributions, are increasing costs. The hourly contributions are statutory as well. I think when you look at the treatment, the Court of Federal Claims logic falls apart because they looked at it as it's statutory to have withdrawal liability. And that's true. You can be sued if you don't pay your withdrawal liability. That's what occurred in this case. But Call Henry, once they've entered into that union contract, there's a section, section 29 U.S.C. 1145, that says the hourly contributions are now statutory. We can be sued if we don't do our hourly contributions. Of course, Call Henry did all of their hourly contributions, was not sued for that, and the government reimbursed for that. So in our view, it's not unlike the Lear-Siegler case where you have a contractor elected a defined benefit plan, in this case health insurance. They could have elected any plan on the market as long as it was not lesser than the one that the predecessor contracted. What if you had lost a government contract and then entered into doing business with a private company? And then at that point, the union was decertified. Would you – I mean, who would have had to pay the withdrawal cost debt? So make sure I understand the question. Had we went through, there was no withdrawal liability, we're out of the contract, government contract, and then we have to withdraw. And there's withdrawal liability because it's underfunded. Well, in our view, that's still price adjustment. It's similar to the severance pay cases. That's exactly what happens. So even 20 years down the road, if somehow you change pension plans, do you think the government is liable for withdrawal costs? If it's for accrued vested benefits, it's accrued certainly during the time of the contract. Now, if they continue in on private business and they're accruing additional benefits, I think there's – we would not be here saying you're on the hook for that. But you can be on the hook for that allocable share that accrued during the term of the government contract. In this particular case, the severance benefits cases illustrate that contract, union contract is entered into. They don't know who's going to have – if they're going to have severance benefits because it's determined at the end of the contract when we decide employees, do they get picked up by the new contractor or not? If they get picked up by the new contractor, typical union contract says you're not going to pay severance benefits. Once they're picked up by a new – if they're not picked up by a new contractor, though, then severance benefits kicked in. The contract's over, and the ARCTEC case has come from the Board of Contract Appeals and Armed Services, BCA, and the government contract and resources case, both relying on the Lear-Sigler case, said yes. That's associated with the terms of the government contract. It was mandated by the Service Contract Act, even though you can't tell if you're going to have that liability until the end of the government contract. Government's on the hook for it. That's the quid pro quo. Here what we're doing, call Henry, is simply providing pension benefits that are required by the Service Contract Act. The flip side of the coin is we are not – when we're bidding on this, we're told the Teamsters contract, that's where you look for your wages and your fringe benefits. We look and we see there's pension benefits. We need to decide do we get in that plan or do a commensurate plan. We choose that plan. It's now the union contract as a wage determination going forward with each anniversary year. We are not allowed by the price adjustment clause to factor in any kind of contingencies in case the plan goes south, things of that nature. We would not do that. We're not allowed to do that. Is this a foreseeable contingency? I don't even know if that matters. But I understand the policy that you're explaining here for why it is that the contracts operate that way. But it seems like it's more remote withdrawal liability as opposed to increase in price. And the question, as the court below said, withdrawal liability wasn't incurred as a cost of complying with the CBAs. Instead, it was incurred because of the withdrawal from the Teamsters. And then the statutory provision providing that there's this withdrawal liability when you do that. Whether it's foreseeable or not, in our view, is not a relevant issue. It's not imposed by the Service Contract Act or the price adjustment clause. But it is foreseeable. It's not foreseeable in that you can calculate a specific amount any more than the severance is. But any time you enter into a multi-employer pension plan, you know there's a possibility, if it's not funding, of stock market crashes. It's all time. Had Call Henry withdrawn before 2006 when the stock market's booming, there is no withdrawal liability. But unfortunately here, the union was decertified in the midst of the downturn, which is what kills their pension plan. Call Henry, unable to price that contingency into it, has done nothing but provide the benefits that Service Contract Act requires them to do. It cannot price into contingencies, and now it's left holding the bag for carrying out the purposes of both Service Contract Act and price adjustment. That's exactly what the price adjustment clause is for. These kinds of benefits that I think are foreseeable, even unforeseeable, caused us to increase prices so that we can pay the benefits that the government requires us to pay. Aren't those circumstances different or apart from any change in the wage determination? This scenario that you, you know, the downturn, and now you're in a different, you're talking about the timing and all. That has, it seems to me that that doesn't have anything to do with the wage determination obligation under the national contract. It just tells you, you need to pay at a certain level. Well, respectfully, we disagree. I think this is exactly what the price adjustment clause is for. I guess I'm asking you to respond to that. I'm not saying something. No, I understand. The health insurance in Lear-Sigler is another example of that. What happens with the health insurance, same as with pension plans, is you have to have periodic actuaries that try and ballpark what it's going to take to provide that benefit. Sometimes they're close. Sometimes they're wrong. Sometimes, because of investment experience, they're dramatically wrong to where you have to increase funding. So the wage determination is every annual anniversary you're here, the wage determination is incorporating the pension, the pension benefits. Then once you've been providing the pension benefits pursuant to that wage determination, which is just the union contract. But that's all that the NASA contract addresses, right? It requires. I'm sorry? Go ahead. It only ties you into the wage. It creates an obligation with respect, for NASA's part, with respect to wage determinations. But the wage determination under Section 4C of the Service Contract Act, that is Carl Henry's Teamster contract, the fringe benefits, and the wage provisions. That is the wage determination. So here, once we've decided we're going to get into this particular pension plan, every time there is a wage determination, every annual anniversary year, they're reincorporating the pension benefits in Carl Henry's Teamster's contract. So here, there's no question in this case that that contract requires Carl Henry to pay the pension benefits in the Teamster's plan. All we're saying here is that since the union contract, which is the wage determination, requires us to pay these pension benefits, price adjustment has to pay for the cost of it, regardless of what you call it, the hourly contribution or the withdrawal liability. Here, the Court of Federal Claims focused on the fact that it's statutorily required, but looking at the language in the Service Contract Act, it says the fringe benefits shall include medical or hospital care, pensions on retirement or death, compensation for injuries, illness, vacations, holidays, that sort of thing. The provision that they're citing says, and other bona fide fringe benefits not otherwise required by federal, state, and local law. The focus is on the benefits, not the cost of the benefits. The benefits, by that section, says the pension benefits. So we had an obligation under the Service Contract Act to provide these pension benefits. The Multi-Floor Pension Plan Protection Amendments Act does not require this pension. It only governs it and regulates it once you make that decision. It appears I let you run. I'm sorry. That's OK. We'll put you back in two minutes. Thank you. I appreciate it. Mr. Norway. May I please report? This case really boils down to what is provided for in the collective bargaining agreement that's applied. The terms of the collective bargaining agreement are what are in the wage determination. And this goes back to the Aleman Food Services case that's cited in the brief 994 Fed Second 819. And the determinative question in that case, just like this case, was what is provided for in the collective bargaining agreement. And in Article 23 of the collective bargaining agreement here, the only legally enforceable obligation that Paul Henry entered into was to pay fixed contributions to a pension plan. That is the scope of fringe benefits that are required under the Service Contract Act. And you can go through the Department of Labor Regulations 29 CFR Part 4 in 4.163 subparagraph I that explains that the successor's obligations are governed by the terms of the collective bargaining agreement. Going back further on, 4.171A, the bona fide fringe benefits are the legally enforceable obligations in the written collective bargaining agreement. It's one of the criteria. So if – I find this confusing. If the collective bargaining agreement had a provision in it that said if a company chooses to not negotiate with the Teamsters anymore or the union decertifies – employees decertify from the union, they're liable for these contribution costs, the make-up costs. Would it then be allowable under the cost clause? I mean if it was – there's a long way of saying if what they're asking for was mandated by the collective bargaining agreement, not a federal statute, would the government be required to pay it under the cost reimbursement clause? Perhaps. And I'm wavering on that, Your Honor, because it's in the collective bargaining agreement. Once it is in the collective bargaining agreement under the Service Contract Act, if it is at substantial variance with the fringe benefits that are provided, then the agency can challenge that collective bargaining agreement. So the first step is getting it in the collective bargaining agreement, and then there are provisions in the SCA which will allow, for instance, if it's not an armed claims transaction. Sure, but I mean I don't see how you could have any legitimate basis for challenging that here because it's an obligation imposed by the federal government. It's certainly not – they're giving benefits that are not commensurate with the rest of workers in the country because every pension plan is required to do this. Right, and I think the basis of your question is, Your Honor, is if it's in the collective bargaining agreement, that's the fringe benefit, and that is our position here. If it's in the collective bargaining agreement, required by the collective bargaining agreement, it would be part of the fringe benefits provided that are the minimum requirements under the Service Contract Act. Can I ask you a factual question because I don't think the record really developed on this because it wasn't really briefed this way. Is there any question of whether all of what they're asking for is eligible to the employees that work for the government during a time period when all these pension issues arose? So that is a much more complicated question, Your Honor. The employees for Call Henry were all at this facility, so those employees were definitely under this contract. However, how a withdrawal liability is calculated is much more complicated. There are actually four statutory methods. Three of them are based on the pro rata share of the contributions that were being paid at a particular snapshot in time. So that can impact how much a particular employer that withdraws would actually pay for the unallocated vested benefits of its employees when it leaves. So you could have a situation where, for instance, you have one employer, not the government contractor, who is actually paying 90% of the contributions to a fund. It goes bankrupt. It does not pay its withdrawal liabilities. Under Title IV of ERISA, the pension plan is required to continue paying that level of benefits. So that employer goes away, and then the government contractor, several years later, withdraws. That government contractor, even though during many parts of the years it was maybe 1% or 2% of contributions to its funds, its basis, its withdrawal liability, can be the pro rata share of the contributions at the time it withdraws or actually the end of this period. So it might be forced to make up for other parties that didn't meet up to their obligations. Yes, Your Honor. That is exactly the purpose of the withdrawal liability. So I assume that's your argument about why this isn't part of the normal wages and benefits determination required under the contract, because it's not necessarily tied to the wages and benefits paid to these employees. It could be due to wages and benefits paid on private employers with other union employees. Correct, Your Honor. And you can think of hypothetical examples where it becomes very difficult to parse out what work was performed under a government contract and what work was performed under contracts with private parties. For instance, if it was a supplier for steel that supplies steel for building public bridges and at the same time for building buildings, it can become very difficult to parse out what those benefits are for which particular contracts. I did want to point out one thing, Your Honor, when it came to the contributions. And my colleague had said that contributions didn't matter if they're contractual obligations. And in fact, in this area of the law, it does matter. And the remedies available are different based on the source of the duty to contribute. And I'll direct Your Honor's attention to the Laborers' Health and Welfare Trust versus Advanced Lightweight Concrete. In this case, it's not cited in the briefs, Your Honor. It's 484, United States 539. And it goes specifically to the factual scenario that my colleague suggested that happened here where there was a continued – where there was a – they continued to pay the contributions after the expiration of the CBA when negotiations for a new CBA weren't in part. And that case says that the remedy in Title I of ERISA for the contractual obligation to contribute to a union is provided by U.S.C. 291132. But if the employer should choose not to pay – to continue paying those, the remedy is not to go into district court, but they have to go to the National Labor Relations Board. And so the remedy available to the employer is different based on the source of the obligation. And that is analogous to what we're asking for here. If there are no questions, Your Honor, for these and the reasons we present in our brief. Thank you very much. We've got two minutes, Mr. Kogan. Thank you, Your Honor. I'll be brief. The issue of what is in the union contract, the government has taken a position that all that the union contract provides is an obligation to contribute hourly. That is incorrect. In our brief, we cite what it says in the union contracts is the – after providing for the contributions, the agreed payment set forth by the employer shall be used by the pension fund to provide retirement benefits for eligible employees in accordance with the pension plan of the fund as determined by the trustees of the pension fund. The employer agrees to become a party to the agreement and declaration of trust established in the Teamsters pension fund and to be bound by all the terms and provisions thereof. This is standard language in union contracts. What that is saying is we are bound by the trust fund of the Teamsters, which sets forth the schedule of benefits. This is not simply we contribute $2 an hour and that's the sole obligation. We are contractually obligated to provide these pension benefits, and this is a factual issue. We're on a motion to dismiss. If there's some ambiguity in that language, it should go back to the court of federal claims to determine what the intent of the parties was. We feel pretty comfortable we can show that we are required by that language to provide specific pension benefits as outlined in that trust document. We don't dispute that the union contract controls. We view it much more broadly than the government does. That may be a factual dispute. I would only address a couple of things. The definition under the Multi-Employer Pension Protection Amendments Act specifically defines our withdrawal liabilities, our allocable share of the benefits that are vested. So we're not on the hook for withdrawal liability for some other employees or for future unvested benefits. We're on the hook for what the actuary says are vested benefits at that point in time. On the last issue with the NLRB, I haven't had a chance to review that particular case, but there are some NLRB cases that provide a different remedy when an employer refuses to continue to pay into a pension plan after withdrawal liability because they have an obligation under labor law to maintain the status quo. If they don't, then the union can go after them for that. That's completely separate and different from the case here. Our issue is we had to provide these pension benefits. We paid to provide them. It was accelerated by withdrawal. The government should have given us a price adjustment. Thank you. Thank you.